SANDRA D. LYNCH, ESQ., P.C.
Travel Pacificana Building, Suite 3
207 MARTYR STREET
HAGÅTÑA, GUAM 96910
Telephone: (671) 472-8889
Fax: (671) 472-8890
E-Mail: sdlynch@ite.net

*Attorney for Plaintiffs*

FILED
DISTRICT COURT OF GUAM
MAY 1 0 2004
MARY L. M. MORAN
CLERK OF COURT

75

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF GUAM

| | |
|---|---|
| MICHELLE D. RAMOS, et al.<br><br>Plaintiffs,<br><br>vs.<br><br>LSG LUFTHANSA SERVICE GUAM, INC., et al,<br><br>Defendants. | CIVIL CASE NO. 03-00028<br><br>DECLARATION OF PLAINTIFF IN SUPPORT OF JURISDICTION OVER INTERNATIONAL DEFENDANTS |

I, Michelle Ramos, hereby make the following Declaration from personal knowledge:

1. I held many positions, including that of Finance Manager for LSG Guam for several years before I was forced to resign. As part of my duties, I corresponded daily with the various offices worldwide for the following designations, shown by both their designation and their parent company:

| | |
|---|---|
| LSG AG | LSG Lufthansa Service Holding AG (Germany) |
| Sky Chefs | Sky Chefs, Inc., USA |
| LSG USA | LSG Lufthansa Service USA, Inc. |
| LSG Asia | LSG Lufthansa Service Asia, Inc. |
| CAT GUM | LSG Catering Guam, Inc. |

| | | |
|---|---|---|
| | LSG GUM | LSG Lufthansa Service Guam, Inc. |
| | CAT SPN | LSG Catering Saipan, Inc. |
| | LSG SPN | LSG Lufthansa Service Saipan, Inc. |
| | LSG Sky Chefs | Merger completed in 2001 between LSG AG and Sky Chefs |

2. During my tenure with LSG, I was personally aware of the following Management changes from 1996 – 2003:

A. My positions: [Michelle D. Ramos]:

Chief Accountant – LSG GUM & LSG SPN: July 1996 – 1997

Manager, Finance & Admin. – LSG GUM & LSG SPN: 1997 – 2003

Acting GM in absence of GM/MD – LSG GUM & LSG SPN: Nov. 1998- March 2003

Officer/Director/Stockholder – LSG GUM & LSG SPN: Sept. 1999 - March 2003

B. General Manager/Managing Director – LSG GUM & LSG SPN

Mr. Werner Gerst: up till November 1996

Mr. Norbert Moog: November 1996 – March 1997

Mr. Reinhard Guth: March 1997 – March 1998

Mr. Frank Fischer: March 1998 – December 1999

Mr. Shane Smith: December 1999 – August 1999

Mr. Fritz Pandalitschka: August 1999 – December 2003

C. Production Manager – LSG GUM

Mr. Norbert Moog: until March 1997

Mr. Klaus Ohl: March 1997 – November 1998

Mr. Gino Perez: March 2002 – January 2003

D. Executive Chef – LSG GUM

Mr. Ernst Derenthal: until December 1996

Mr. Bertrand Haurillon: December 1996 – April 1998

Mr. Chris Urban: April 1998 – March 2002

-2-

Mr. Tony Benitez: April 2003 - Present

E. <u>Human Resources Manager – LSG GUM & LSG SPN</u>

Ms. Jeanne D'Amassa: until June 1997

Ms. Lori Villarde: June 1997 – 1999

Ms. Madeline Horinouchi: 1999 – 2000

Mr. Jose _____: October 2002 – December 2002

Mr. Luis Baza: December 2003 - Present

F. <u>Customer Services Manager – LSG GUM & LSG SPN</u>

Ms. Eva Geisslreither: until March 1997

Ms. Ursula Ohl: March 1997 – November 1998

Ms. Annette Tangye/Ms. Julia Smith: November 1998 – November 1999

Ms. Tanya Damian: December 1999 – 2001

Mr. Kelvin Chan: 2001 - Present

G. <u>Operations Manager – LSG GUM</u>

Ms. Dolores Hite: until 1997

Mr. Jojo Cuison: 1997 – 1999

Mr. Kelvin Chan – 1999 – Present

H. <u>Purchasing Manager – LSG GUM</u>

Mr. Cano Callazo-Cruz: until 1997

Mr. Robert Hernandez: 1997 – 1999

Mr. George Hernandez: 1999 – 2000

Mr. Robert Hernandez: 2000 – 2003

I. <u>Resident Manager – LSG SPN</u>

Mr. Martin Rainer: until 1997

Mr. Rene Willen: 1997 – 2001

Mr. Patrick Ho: 2001-2002

-3-

Case 1:03-cv-00028   Document 79   Filed 05/10/2004   Page 3 of 18

3. The "Control via Ownership" question can best be described as follows:

   A. LSG AG was a separate entity from Sky Chefs. The two companies entered into an agreement to market themselves as LSG Sky Chefs to capitalize on their collective expertise in airline catering. The combination of the two made for the largest airline catering network worldwide known.

   B. LSG Gum and LSG SPN were owned by the German based group, which also owned most of the kitchens outside of North and South America. LSG GUM was 100% owned by CAT GUM which was 100% owned by LSG USA. LSG SPN was 100% owned by CAT SPN which was 100% owned by LSG Asia. LSG USA and LSG Asia are 100% owned by LSG AG. LSG AG is a 100% owned subsidiary of Lufthansa Airlines.

   C. From 1996 – 2001, LSG Sky Chefs was segregated into 4 distinct operational and reporting regions: Germany, the Americas, Asia Pacific, and Europe/Africa.

4. Each "kitchen" or catering business basically reported to the entity that owned it, either LSG AG or Sky Chefs. Because of the common ownership, LSG GUM and LSG SPN reported to LSG AG through their regional office in Hong Kong, LSG Asia. LSG Asia in turn reported to LSG AG. Both reporting and management were done via LSG Asia, despite being under the jurisdiction of the US.

5. In July 2001, LSG AG exercised its option to purchase Sky Chefs and the official merger took place. An international reorganization took place to redraw the lines and reposition the responsibilities.

6. From the topmost level on down, the Executive Board of LSG AG was restructured functionally:

   A. Mr. Hans Rech, Chairman/CEO – previously from LSG AG

   B. Mr. Ulrich Broscher, VP of Operations – previously from LSG AG

   C. Mr. Hans Albrecht, VP of Human Resources – outside hire

-4-

D. Mr. Patrick Tolbert, VP of Finance – previously from Sky Chefs

E. Mr. Randall Boyd, VP of Marketing/Cust Serv – previously from Sky Chefs [Mr. Boyd has since left LSG Sky Chefs at the latter part of 2003]

Note: Mr. Rech, Mr. Broscher and Mr. Albrecht are stationed in Germany while Mr. Tolbert and Mr. Boyd remained in the USA.

7. The reporting lines were also redrawn regionally: Europe/Africa, The Americas, and Asia/Pacific, and each region was assigned to a member of the Executive Board for ultimate oversight:

A. Mr. Ulrich Broscher oversaw Europe/Africa;

B. Mr. Randall Boyd oversaw the Americas; and

C. Mr. Patrick Tolbert oversaw Asia/Pacific

8. Mr. Hans Rech as Chairman of the Board and Mr. Hans Albrecht as the VP in charge of HR bore responsibility of all regions. Accordingly, as a member of the Executive Board for LSG AG while an employee of LSG USA, ultimate executive decisions rested with Mr. Tolbert. These changes became the driving force for more changes within the entire organization as the two companies struggled to become one. Integration and assimilation to standardize the ways and means of operations, reporting and overall management became the mission.

9. Reporting and management was twofold: by function (ie. Finance, Marketing, Operations and Human Resources) and then by region (ie. Europe/Africa, Americas and Asia/Pacific)

10. Specifically for LSG GUM and LSG SPN:

A. The <u>Management Agreement</u>

LSG GUM pays LSG USA 7.5% of gross revenues from airline catering and restaurant sales for "management" services. LSG SPN pays LSG USA 5% of gross revenues. This management fee has been paid every year during my entire employment with LSG GUM. For this combined fee of approximately $1.3 million, LSG USA, prior to the merger, provided marketing services for LSG

-5-

GUM and LSG SPN, mainly negotiating the global contracts for any US based carriers. For the Asian based carriers, the global contracts are handled out of LSG Asia. LSG GUM and LSG SPN were limited in their involvement to just pricing out the new menu items and recommending the service charges. In addition, the management fee paid for the annual filing of the corporate documents under LSG USA, which LSG GUM was part of (not LSG SPN).

11. After the merger, the services provided for the management fee were largely increased as both LSG GUM and LSG SPN participated in the globalization and standardization projects. LSG Asia has a separate agreement with LSG USA to oversee both LSG GUM and LSG SPN for a fixed amount ($20,000 per month). I believe this amount was increased in the Y2003.

12. The management agreement has been under revision for renewal for many years. It is still being worked on by LSG AG, LSG Asia and LSG USA. However, the fee is still being remitted annually absent a renewed contract. A new management contract was yet to be signed as of March 2003.

13. Comments I received from LSG GUM's and LSG SPN's auditors are that the scope of work needs to be increased to substantiate the amount collected. Should the taxing authorities in GUM or SPN question the deduction taken they may find that the fees paid to LSG USA are nothing more than dividends in disguise (ie. Tax evasion), taken as deductions to reduce taxable income and thus the overall tax liability owed to the respective governments.

14. The management letter issued by Ernst & Young, auditors for LSG GUM and LSG SPN, document the need for adequate documentation and the risk should an audit take place. LSG Asia, LSG USA and LSG AG were all aware of this. As part of the financial management team in the forefront, I was privy to all this information, as were the other directors, and managers in Guam, Hong Kong, Asia, the US, and of course, Germany. This is one of the principal reasons the companies try to maintain a purported "separate identity" so that they can pay money from the more profitable ventures to the parent companies. In reality, the parent company which receives the "fee" should declare it as a dividend and therefore income.

9. As for international departmental oversight:

A. <u>Accounting</u>.: During Mr. Gerst's tenure, the monthly financial reports were submitted to LSG Asia for review and closing. LSG Asia consolidated the results along with theirs and submitted the reports to LSG AG. LSG Asia provided guidance in the reporting and forecasting in the preparation of the monthly reports as well as asked questions on the results.

During Mr. Guth's tenure, the monthly financial reports were submitted directly to LSG AG with copies to LSG Asia. LSG AG took over the role of LSG Asia in the review and reporting of both LSG GUM and LSG SPN's results.

Under LSG AG's direction, the requirements and procedures for the monthly, annual and budgetary financial reporting was revised. LSG GUM and LSG SPN were made to report a rolling 12 month forecast from the reporting month.

From Mr. Fischer's tenure onward, the monthly financial reports were again redirected back to LSG Asia for their consolidation before submitting to LSG AG.

To ensure that the process went smoothly, I attended annual conferences and training sessions related to the finance function in both LSG Asia and LSG AG. (ie. LSG AG decided about 4 years ago that the company would start reporting the results using International Accounting Standards ("IAS") and arranged for all controllers to meet in Germany for an international training session. Shortly thereafter, the books were adjusted to IAS.)

Since both LSG GUM and LSG SPN report to LSG Asia, it is LSG Asia that the 2 entities present their annual budgets and mid range plans for approval.

When LSG AG took over Sky Chefs, all units, including LSG GUM and LSG SPN, participated in the globalization of the financial reporting function. Spearheaded by LSG USA, along with their consultants, Accenture, LSG GUM and LSG SPN implemented a new reporting tool that would aid in the consolidation reporting of LSG Sky Chefs.

B. <u>Human Resources</u>: All positions deemed executive/managerial positions were authorized by LSG Asia or LSG AG. When I first applied with LSG Lufthansa Service Guam, Inc.

-7-

(LSG GUM), not only did I have to interview with the then local General Manager, Mr. Werner Gerst, but I was made to do a phone interview with Mr. Michael Luk, Regional Controller for the Asia Pacific Region as well as the Vice President of Finance for the Asia Pacific Region, both of whom were stationed in Hong Kong. Final decision for my hire came from LSG Asia.

Reinhard Guth, Frank Fischer, Norbert Moog, Klaus Ohl, Ernst Derenthal, Bertrand Haurillon, Chris Urban, Ewa Geisslreither, Ursula Ohl, and Martin Rainer were all appointed to their respective positions out of LSG AG. Local management had no involvement in their appointments, term of contracts, compensation package and benefits except to live by them. No performance evaluations or discipline at the local level was allowed.

Shane Smith, Fritz Pandalitschka, Kelvin Chan, Rene Willen and Patrick Ho were all appointed to their respective positions out of LSG Asia. Local management had no involvement in their appointments, term of contracts, compensation package and benefits except to live by them.

No performance evaluations or discipline at the local level was allowed. (ie. Mr. Pandalitschka refused to take a writeup on Mr. Urban to the next disciplinary steps because he was an employee of LSG AG. This can be confirmed by Aileen Costello, the Quality Control Officer, who did the writeup.)

Prior to the merger, the local HR manager reported to the Regional HR Manager. Most forms dealing with new hires, status changes and termination of employment, vacation and sick leave requests were from Hong Kong. Even the employee folders were from LSG AG.

For the Union negotiations, it was LSG AG that contracted with Ms. Marty Woodward to assist LSG GUM and LSG SPN with a new contract. It was to both LSG Asia and LSG AG that Ms. Woodward had to report the status of each negotiation.

Additionally, members of the labor relations department out of LSG AG attended the initial Union contract negotiations. It was Mr. Ernst Martin Hoffman-Keining along with his superior that went to Washington to negotiate at the highest level with the Hotel Employees and Restaurant Employees Union the "Washington Agreement" that would dictate the foundation/basic

-8-

understanding that would govern the discussions.

After the merger, HR reporting and oversight was coordinated by LSG Asia but controlled out of LSG USA. LSG USA hired Towers Perrin to conduct a benefits analysis for the entire company and LSG GUM and LSG SPN participated in the survey.

LSG GUM and LSG SPN now report all HR matters first to LSG Asia, through Ms. Phyllis Li, VP of Human Resources and she reports to LSG AG. For the integration project, Ms. Li is reporting to LSG USA, who is spearheading it.

Another example of LSG Asia's oversight was the eventual termination of Mr. Perez. After repeated requests to resolve numerous issues with the Operations of LSG GUM went ignored by Mr. Pandalitschka, Ms. Li flew out to meet with Mr. Perez on the pretense of a familiarization tour of LSG GUM and LSG SPN. Without following the local disciplinary procedures, Ms. Li authorized the termination of Mr. Perez shortly after the meeting.

C. <u>Information Technology</u> or IT: Authorization for the implementation of the MAS 90 Accounting system as well as the purchases of new computers for Accounting, Purchasing and HR came from LSG Asia.

After the merger, a more formal approach to the IT needs was adopted for the globalization/standardization plan. Also spearheaded out of LSG USA, the consulting firm, Accenture, coordinated the project with all the individual kitchens, including LSG GUM and LSG SPN.

Mr. Jesse Rivo flew to Hong Kong to attend a training seminar at LSG Asia for the implementation of the new global reporting system.

D. <u>Operations</u>: The Operations department always included both oversight of the kitchen, transportation, equipment, sanitation, and warehousing. Because Mr. Moog and Mr. Ohl were both from LSG AG, operational oversight via LSG Asia or LSG USA was done with the exception of LSG Hygiene (see below).

However, after Mr. Ohl left, operations was split between Kitchen and Transportation.

-9-

Transportation overseeing equipment, sanitation and warehouseing. The Executive Chef and the Operations Manager reported directly to the General Manager or myself in absence of the General Manager.

When the LSG Sky Chefs combination was completed, standardization of Operations was also in process. "Lean Manufacturing" became the global process for the Operations side of airline catering.

Spearheaded from LSG AG, each region formed its own Lean Manufacturing Task Force. For both LSG GUM and LSG SPN, reporting went through LSG Asia.

To date, Operations is being overseen through LSG Asia.

E. <u>Customer Services</u>: Since I started, LSG Asia has overseen the airline contracts for LSG GUM and LSG SPN. The only participation for LSG GUM and LSG SPN being the actual menu presentation and the pricing information. All other terms of the contracts were set by either LSG Asia or LSG USA depending on where the head office of the airlines were located.

LSG USA and LSG Asia were especially involved in the final resolution to the GRT issue between LSG GUM and Continental Micronesia.

F. <u>Hygiene:</u> All kitchens/units reported directly to LSG AG for hygiene standards. Monthly reports on the hygiene audits conducted by local Quality Control Officers were submitted directly to Germany. Software and forms were all provided for by LSG AG.

Separate fees and payments to LSG AG were made for these services. This was not included with the management fee.

LSG AG, through its hygiene institute also dictated that no other industrial cleaner products would be used in any LSG Sky Chefs kitchen except for Ecolab. LSG GUM and LSG SPN were not allowed to use any other product or go to any other vendor for any cleaning supplies and equipment.

G. <u>Purchasing.</u> When I first joined LSG GUM, purchasing was overseen by LSG Asia. Regional Purchasing Manager, Ms. Irene Wrigley, was implementing a new purchasing system that would allow the required comparative work to be done before initiating any orders. Ms. Wrigley

-10-

would visit the unit at least 3 times a year and was overseeing the local purchasing manager's efforts as well as the implementation of the system.

That changed when Mr. Guth took over LSG GUM and LSG SPN. Purchasing was handled locally with Mr. Guth handling the vendor negotiation. Because of his connection to LSG AG, there was no interference from LSG Asia.

After LSG Sky Chefs was formed, standardization of purchasing policies and powers became a priority. Led by LSG USA, coordinating and consolidating efforts to establish a database between all units went underway. Information on vendors, products, pricings and quantities required were all sent to LSG USA via LSG Asia.

Regardless of the globalization effort, since the beginning of my employment, any expense over HK$50,000 required prior approval from LSG Asia. There is a chart issued by LSG HKG that documents the purchasing authority for the individual units that report to LSG HKG.

H.     GRT. Immediately after I joined LSG Guam and Saipan, I took note of the Guam Gross Receipts Tax ("GRT") and the Saipan Business Gross Revenue Tax ("BGRT") discrepancies from the LSG Guam and Saipan operations respectively.

Continental Airlines, back in 1995, informed LSG Guam that it should be exempt from the GRT for all meals and food products. The only taxable item being service. LSG Guam, with approval from LSG Asia, immediately started reporting the revenues exempt from tax without getting expert opinion or approval from the Department of Revenue and Taxation. Soon after Continental Airlines claimed reduced tax rates should apply for the Saipan BGRT for the same reasons. Again LSG Saipan, with the approval of LSG Asia started applying the reduced rates without obtaining expert opinion or approval from the Saipan government.

I discussed this matter with Mr. Moog, just prior to Mr. Guth's coming on board, and obtained permission to get a tax opinion from Ernst & Young. The opinion rendered from Mr. James Comer, the then tax partner of Ernst & Young confirmed my suspicion that the exemption or the reduced tax rates did not apply to the sales from Continental Airlines.

-11-

I raised the concern during Mr. Guth's management period. Knowing Mr. Woelki's objective was upholding and maintaining the reputation of LSG Sky Chefs and worried that this continued practice will embarrass the company if revealed under audit, Mr. Guth ordered the immediate compliance of all local GRT/BGRT laws and demanded full reimbursement from Continental Airlines.

Mr. Guth informed both Mr. Woelki and Mr. Bauer of the precarious position of LSG as well as Mr. Randall Boyd. LSG Asia was also informed to start discussions with Continental Airlines local management. A collective effort between LSG and Sky Chefs was launched for damage control.

For the next several years, discussions between LSG Sky Chefs and Continental Airlines to resolve the GRT issue was conducted in Germany, the USA, Asia and locally.

An agreement was finally reached between the respective home offices when Bill Meehan, the then former CEO of Continental Micronesia asked the then former Governor Carl Gutierrez for the exemption. A letter was obtained from the Director of Revenue and Taxation granting the exemption but with little basis for the application. Should an investigation into the validity of the exemption be done in the future, there is a good chance that the exemption would be reversed.

16. I am unable to recall the Director of Finance's name for he did not remain in his position for very long. It was known that he was recruited from the US and his management style did not complement the German way of operations. His eventual release from the Company was largely in part due to this unacceptance and some say sabotage of his authority, mainly directed from Mr. Beer.

At that time, all of Executive Management for all German based kitchens as well as the regional office was filled out of Germany or with Germany's approval. At the head of LSG Asia was Mr. Gunther Beer.

It was well known that Mr. Beer was having an affair with the then HR Director, Sue Ann Wong, as well as that any action by any manager that could be construed to contradict Ms. Wong's

authority would meet with severe repercussions by Mr. Beer.

The LSG Guam management team consisted of:

Mr. Werner Gerst, General Manager

Mr. Norbert Moog, Production Manager

Ms. Eva Geisslreither, Customer Service Manager

Mr. Ernst Derenthal, Executive Chef

Ms. Jeanne De'Amassa, HR Manager

Ms. Michelle Ramos, Chief Accountant

Mr. Martin Rainer, Saipan Resident Manager

All of which, except for Ms. De'Amassa and myself, had their rent paid for, collected a housing allowance, free insurance for themselves and their families, were provided a company car and or free gas, the LSG Yellow Card that allowed discounted travel with LSG and their associated airlines or free tickets annually to return home for vacation.

The organizational chart at that time reflected Mr. Gerst as the overall person responsible for both the Guam and Saipan Operations. The reporting line then had Mr. Moog directly reporting to him as both Production Manager and Assistant General Manager. The rest of us were then reflected as direct reports through Mr. Moog as equals along with:

Mr. Cano Callazo Cruz, Purchasing Manager

Mr. Robert Hernandez, Warehouse Manager

Ms. Dolores Hite, Operations Manager

Mr. Mariano Zalvidar, Sanitation Manager

Mr. Celso Castillejos, Equipment Manager

Mr. Mar Ramos, Maintenance Manager

Ms. Bettina Beyer, Quality Control Specialist

Ms. Joy DeGuzman, Trayset Supervisor

Mr. Chris Bejado, Airport Concessions Manager

-13-

In reality, because Mr. Moog and Ms. Geisslreither were involved / engaged to be married, Ms. Geisslreither held as much authority as Mr. Moog. It was well known to do whatever Ms. Geisslreither wanted or risk discipline from Mr. Moog.

17. In October 1996, Mr. Gerst was dismissed from LSG Guam for what the company deemed a conflict of interest. Mr. Gerst had authorized a concession at the Guam International Airport for a company his wife was involved in as well as sold LSG products to this same company for sale at the airport, thereby allowing another company to make profit off LSG products that it could have kept in house.

Mr. Moog reported the activity to LSG HKG causing a full blown in house audit. To conduct the audit, Michael Luk, Asia Pacific Controller, and Ms. Sue Ann Wong, Asia Pacific HR Director flew in to conduct the inquiries and review the records.

It can also be confirmed through several witnesses that Mr. Moog was directed to watch over Mr. Gerst and report directly to LSG Asia. Mr. Moog wanted his job.

After the dismissal, Mr. Moog was appointed acting General Manager until a suitable replacement could be found.

18. In December 1996, Klaus and Ursula Ohl arrived from Germany as the replacements for Mr. Moog and Ms. Geisslreither. Contracts for both Mr. Moog and Ms. Geisslreither were soon to expire and they were both scheduled to relocate to Bankok by March 1997 to head the Bankok kitchen's Operations and Customer Service Operations. They could not leave however, until a new General Manager was found.

In the meantime, Mr. Moog familiarized Mr. Ohl with the Guam and Saipan Operations while Ms. Geisslreither trained Mrs. Ohl on the Customer Service side. Although Mr. Ohl was an experienced Production Manager, Mrs. Ohl had no previous training or experience. Mrs. Ohl's previous expertise was in HR Management. It can be confirmed that Mrs. Ohl's performance and credibility as the Customer Service Manager, rested largely on the credibility of her husband. The tradition continued.

It was shortly thereafter that Mr. Reinhard Guth joined LSG Guam and Saipan in February 1997 as the newly appointed General Manager. As with the Ohl's, Mr. Guth was hired in Germany. There were no local interviews or advertisements taken out to fill the position.

With the new General Manager in place, Mr. Moog's transfer was finalized. Mr. Moog was compensated for acting in the capacity of General Manager for the 4 months he was acting. He was paid the difference in salary for the time he served as GM.

As a direct appointment from then LSG Lufthansa Service CEO, Mr. Helmut Woelki, Mr. Guth's position was renamed to Managing Director from General Manager. In addition, Mr. Guth was allowed to bypass reporting to LSG Asia. Mr. Guth felt it beneath his authority to report to the Asian Group and therefore had direct reporting to Germany.

Under Mr. Guth's short tenure as General Manager, the reporting and management lines flowed directly to Germany with LSG Asia informed. Mr. Guth communicated directly with Mr. Woelki on all matters relating to the Operations, Mr. Rainer Bauer, then CFO of LSG Lufthansa Service on all issues relating to finance, Mr. Randall Boyd, Vice President of Marketing from the Sky Chefs side, Dr. Gork from the LSG Hygiene Institute in Germany and Mr. Ernst-Martin Hoffman-Keining of LSG Lufthansa Service for all HR issues.

19. It was under Mr. Guth's tutelage that numerous airline catering reference materials were given to me for my edification into the industry. It was with this material that I developed many of LSG Guam and Saipan's costing, pricing, statistical and performance measurement systems. Many of which I spearheaded incorporation into the IT system.

It was also under Mr. Guth that recognition for my hard work and dedication was first given. Although the reporting line showed Mr. Ohl as second in command in the event of Mr. Guth's absence, Mr. Guth often instructed the entire management to go to Mr. Ohl for operational concerns and to me for any financial or administrative concerns. To signify the authority given, Mr. Guth promoted me to Administration and Finance Manager along with a modest raise. He also promised to go to Germany and request that the same benefits afforded other Administration and Finance

Managers worldwide be extended to me, namely the extension of the insurance benefits as well as the travel privileges. The rest would have to come as adjustments in salary.

20. This shared authority did not sit well with Mr. Ohl who constantly reminded me that he was "No. 2". I believe that Mr. Ohl did not like his authority disseminated but more so to a local woman with hardly as much airline catering experience as he and so did his best to ensure separation between Operational and Administrative functions.

It was under Mr. Guth that I prepared the LSG Guam and Saipan budgets and started attending the Board of Directors meetings in Hong Kong. Although Mr. Guth had the ear and authorization of Germany, he was still required to go through the Budget Presentation process through Hong Kong because Guam and Saipan's results were incorporated into the Asia Pacific results. Through Mr. Guth and his connections in Germany, LSG Guam found a replacement for our exiting Executive Chef. Again there were no local interviews or advertisements, Mr. Guth merely arranged for Mr. Christian Urban to come in. Although Mr. Urban was required to sign a "local" contract, he enjoyed the same benefits as all off-island hires. The same benefits which were not extended yet to me.

There was a lot of turnover in management shortly after Mr. Guth took over. Mr. Cano Callazo-Cruz, Mr. Chris Bejado and Ms. Jeanne De'Ammassa turned in notices leaving the Purchasing Manager, Airport Concessions Manager and HR Manager positions open. Ms. Lori Villarde, the HR Assistant was promoted to the HR Manager position and Mr. Robert Hernandez was transferred laterally from Warehouse to Purchasing. Mr. James Quenga was promoted to take the Warehouse Manager position. LSG Guam hired Mr. Robert Wheaton to take over the Airport Concessions but he too did not do well under Mr. Guth and eventually submitted his resignation. Ms. Susan DeVera was hired to take his place.

Ms. Dolores Hite soon after submitted her resignation leaving the Operations Manager position open. That position was also filled in house by Mr. Jojo Cuisson. Numerous positions were also created during Mr. Guth's time. Ms. Julia Smith was brought in as Project Manager to

-16-

oversee the construction of the new LSG Saipan flight kitchen. Ms. Annette Tangye was hired as Executive Assistant to Mr. Guth and myself.

21. Mr. Guth was a very demanding boss who was easily angered. He monitored the performance measurements daily and required explanations from all Managers if any deviations caused revenues to drop or costs to escalate. He was not a subtle person who constantly spoke his mind regardless. It was due to his outspoken nature and disregard for employment laws that the company was hit by 22 EEOC cases.

Charges filed against Mr. Guth were for Sex Discrimination, Racial Discrimination, Age Discrimination, Sexual Harrassment, and Hostile Work Environment. All cases have been either settled or dismissed. The largest settlement went to Ms. Susan DeVera who resigned within her first year anniversary. During these investigations, it can be confirmed that Mr. Ohl spoke to several managers and "encouraged" them not to file or not to provide support for these cases.

22. Around the latter half of 1997, Mr. Martin Rainer's contract as the LSG Saipan Resident Manager expired and Mr. Rainer returned to Europe. He was succeeded by Mr. Rene Willen who interviewed in Hong Kong and with Mr. Guth. He too, was provided housing, car and gas, free insurance and travel privileges.

23. Mr. Guth was transferred to Italy around March 1998 while the EEOC cases were still unresolved. Mr. Frank Fischer, another recruit from Germany, showed up to take over the reigns. Mr. Fischer continued Mr. Guth's legacy about reporting and managing via Germany and keeping LSG Asia informed.

24. With the exception of local purchases for food for the kitchen, which could not be handled by another area, all major decisions were made by Germany, through USA and Asia offices. LSG Guam and Saipan do not operate independently of the parent companies, but instead are given limited and controlled access to a budget, bank accounts, personnel, and other indicia which allow them to operate daily within the confines of the overall management of LSG Holding AG, Germany,

-17-

and the other LSG international entities.

I make this declaration under penalty of perjury this 18th day of April, 2004.

_____
Michelle Ramos

-18-